UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

Franklin P. Lopez,

                  Petitioner,         08-CV-4787 (CPS)

   - against -

                                        MEMORANDUM OPINION
Commissioner of Social Security,        AND ORDER

                  Respondent.

-----------------------------------------X

SIFTON, Senior Judge.

     Pursuant to 42 U.S.C. § 405(g),[1] plaintiff Franklin P. Lopez

("plaintiff") seeks to reverse a determination of the

Commissioner of the Social Security Administration

("Commissioner") that he was not disabled within the meaning of

the Social Security Act ("the Act").  Presently before the Court

are the parties' cross-motions for judgment on the pleadings

pursuant to Federal Rule of Civil Procedure 12(c).  For the

reasons stated below, the decision of the Commissioner is

---

[1] 42 U.S.C. § 405(g) states in relevant part:

> Any individual, after any final decision of the Commissioner of Social
> Security made after a hearing to which he is a party... may obtain a
> review of such decision by a civil action commenced within sixty days
> after the mailing to him of notice of such decision or within such
> further time as the Commissioner of Social Security may allow.  Such
> action shall be brought in the district court of the United States for
> the judicial district in which the plaintiff resides... The court shall
> have power to enter, upon the pleadings and transcript of the record, a
> judgment affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without remand the cause for a
> hearing.

42 U.S.C. § 405(g).

reversed and the case is remanded for further proceedings consistent with this opinion.

**BACKGROUND**

The following facts are taken from the parties' submissions in connection with this motion and the record of the proceedings before the Social Security Administration ("SSA").

**I.   Non-Medical Evidence**

**A. General Background**

Plaintiff was born on August 16, 1970.  Transcript of the Administrative Record ("Tr.") at 105.  Plaintiff has an eleventh grade education, which he completed in Equador.  *Id.* at 112, 521. At the time of his hearing, plaintiff was married and had two children, ages four and 11, both of whom resided with him in Woodhaven, New York.  *Id*. at 521-22.  From 1991 until August 2002, plaintiff worked as a parking attendant.  *Id.*  This job required him to stand and walk for seven hours per day and sit for one hour per day.  *Id*. at 115.  He also wrote, typed or handled small objects for four hours per day, and frequently lifted 10 pounds as part of his job duties.  *Id*.  The heaviest weight plaintiff was required to lift on his job was 50 pounds. *Id*.

In August of 2002, plaintiff stopped working due to back

pain and began to collect unemployment compensation. *Id*. at 522-23.  On November 15, 2003, plaintiff was injured in a motor vehicle accident.  *Id.* at 345.  Plaintiff reported that as a result of the accident, he suffered pain in his neck and back. *Id.* at 523.

## B. Plaintiff's Application For Benefits

In his June 4, 2005 application for disability benefits, plaintiff described his pain as "stabbing" and located in his lumbar region, neck, right leg, right heel, and arms.  *Id*. at 137.  Plaintiff stated that his condition affected his ability to lift, stand, walk, sit, climb stairs, kneel, and squat.  *Id*. at 134.  He could not drive, walk or socialize for any extended period of time due to pain.  *Id*. at 139.  However, in a typical day, he could drop off and pick up his daughter from school, walk no longer than 20 to 30 minutes, watch television, feed his dog, and watch over his youngest child until his wife came home.  *Id*. at 129, 135.  Plaintiff reported that he had difficulty sleeping at night due to numbness in his hand, arms, legs, and back, and that he iced his back and took medication daily.  *Id*. at 130. Plaintiff also stated in his application that he could not cook because he was unable to stand for long periods of time.  *Id*. at 131.  However, he reported that he was able to perform light household dusting, drive a car, and shop for food and baby needs

in 15 to 20 minute intervals. *Id*. at 132-33. Plaintiff did not report any problems with his memory or paying attention. *Id*. at 135-36.

## C. Plaintiff's Testimony At Hearings Before The ALJ

Subsequent to the submission of his application for disability benefits, plaintiff was involved in a second motor vehicle accident on September 5, 2006. *Id.* at 307. At a hearing before the ALJ on January 14, 2008, plaintiff, through an interpreter, testified that the primary pain stemming from the two accidents was his back pain which extended down to his legs causing "needles and pins" in his heels. *Id*. at 523, 530. On the advice of his doctor, plaintiff stopped taking pain medication due to liver damage that the medication caused. *Id*. Plaintiff reported that he could sit for 30 minutes before needing to stand, and that he could stand for 30 minutes before needing to sit. *Id*. at 532. In addition, plaintiff testified that he could only walk for five to seven blocks before experiencing pain, that he could lift 20 pounds, and that he could drive for 15 to 20 minutes to and from his child's school. *Id.* at 532, 536. He stated that he had traveled to Equador to sell land two weeks before the hearing, as well as in September 2007 for two weeks, in 2005 for one week to visit family, and in 2003 before the car accident. *Id.* at 533-35.

## D. Procedural History

Plaintiff applied for disability insurance benefits on June 4, 2005, claiming that he had been unable to work since November 15, 2003, due to a "lumbar spine impairment,[2] severe back pain, [and] herniated disk." *Id*. at 107-08. The claim was denied, and plaintiff filed a timely request for hearing before an administrative law judge ("ALJ"). *Id*. at 91. A hearing was held before ALJ Manuel Cofresi on January 14, 2008 and February 13, 2008. *Id*. at 480-516, 517-66. On March 18, 2008, ALJ Cofresi denied plaintiff's application for benefits, finding that plaintiff retained the capacity to perform a full range of sedentary work. *Id*. at 38. Plaintiff appealed the ALJ's decision to the Commissioner's Appeals Council. On October 9, 2008, the Appeals Council denied review, making the ALJ's decision the final determination of the Commissioner. *Id*. at 4-7. Plaintiff then commenced this proceeding seeking review of the Commissioner's determination.

## II. Medical Evidence

During the relevant time period, plaintiff's treating physicians included Dr. John J. McGee, Dr. Giovanni Marciano, and

---

[2] Spinal impairment relating to the loins, or the part of the back and sides between the ribs and the pelvis. *See Stedman's Medical Dictionary* (*"Stedman's"*) at 1034 (27th Edition, 2000).

Dr. Carlisle St. Martin.  Plaintiff has also been examined by other doctors, including Dr. Richard W. Johnson and Dr. Joseph R. Merckling Jr., as well as acupuncturist Hong Zhu Wu.  At the Commissioner's request, consulting physician Dr. Steven Calvino examined plaintiff, and medical expert Dr. Louis Lombardi opined on plaintiff's medical records.

## A. Medical Evidence Relating To First Car Accident

On November 15, 2003, plaintiff was injured in a motor vehicle accident and brought by ambulance to the Jamaica Hospital Emergency Room.  *Id.* at 151-53.  Hospital intake records state that plaintiff complained of numbness, dizziness, tenderness, and lower abdomen and back pain on his left side, which radiated to his lower extremity.  *Id.* at 152-53.  Plaintiff rated his pain as a "8" on a scale from 1-10.  *Id.*  Examination revealed a normal gait and full muscle strength.[3]  Plaintiff was diagnosed with musculoskeletal lower back pain.  *Id.*

### i. 2003-2005 Findings Of Dr. John J. McGee, Treating Physician, And Associated Practitioners

---

[3] Emergency room physician's notes regarding the examination of plaintiff's vertebral spasms and spine tenderness are unclear.  *Id.* at 152-53. The parties give different descriptions and their briefs do not resolve the dispute.  Plaintiff's brief states that "examination revealed tenderness of the spine and muscle spasm," whereas defendant's brief states that "plaintiff had no paravertebral spasm, no lumbosacral spine tenderness, and a negative straight leg test."  *See* Pl. Br. at 2; Def. Br. at 4.  The notes are illegible and thus, plaintiff's emergency room condition cannot be determined on this record.

On November 19, 2003, plaintiff began initial acupuncture and chiropractic treatment at Advanced Medical Rehabilitation P.C. in Rego Park, New York.  *Id*. at 235-40.  In his consultative examination with chiropractor Joseph R. Merckling, Jr., on November 19, plaintiff complained of headaches, dizziness, neck stiffness and pain, shoulder stiffness and pain, left wrist pain, mid-thoracic pain, chest wall pain, lower back stiffness and pain radiating to the buttock and lower extremities, right leg pain, difficulty sleeping, and increased pain with any movement of the neck and back.  *Id*.  Dr. Merckling noted that plaintiff walked with a normal gait but had poor posture.  *Id*. at 239.  Cervical orthopedic,[4] lumbar, and pelvic testing resulted in positive results.  *Id*.  He diagnosed plaintiff with, *inter alia*, cervical, thoracic,[5] and lumbar sprain/strain.[6]  *Id*. at 239.  Dr. Merckling recommended that a Magnetic Resonance Imaging ("MRI")[7] of the cervical and lumbar spine, neurological testing, and muscle and

---

[4] Relating to the neck's function within the musculoskeletal system, extremities, and spine.  *See Stedman's* at 324, 1277.

[5] Relating to the thorax, the upper part of the trunk between the neck and the abdomen; it is formed by the 12 thoracic vertebrae, the 12 pairs of ribs, the sternum, and the muscles attached to these.  *See Stedman's* at 1828-29.

[6] Sprains are limited to ligaments whereas strains affect muscles, tendons, or muscle-tendon combinations.  *See* Lumbar Back Sprain and Strains, http://www.spineuniverse.com/displayarticle.php/article1454.html (last visited August 7, 2009).

[7] Magnetic Resonance Imaging, used to visualize the internal soft tissues of the body.  *See Stedman's* at 1135.

vertebral range of motion[8] testing be performed, and that plaintiff begin a comprehensive rehabilitation program. *Id*. at 240. He further opined that plaintiff was completely disabled.[9] *Id.*

On December 10, 2003, Dr. John J. McGee performed a comprehensive medical evaluation of plaintiff at Advanced Medical Rehabilitation P.C. *Id*. at 370. Plaintiff complained of headaches, insomnia, visual disturbance, neck pain and stiffness radiating to both shoulders, middle and lower back pain radiating to the right leg with numbness and tingling, difficulty rising to walk after sitting, and difficulty standing, walking and bending. *Id.* Dr. McGee examined plaintiff, noting that he was in severe distress, anxious, had difficulty concentrating, and suffered from episodes of insomnia and flashbacks. *Id*. at 371, 227. Dr. McGee's physical examination revealed diminished range of motion and pain on extremes of motion in the cervical spine, lumbar spine, and both shoulders. *Id*. at 371-72. Dr. McGee also

---

[8] The range through which a joint can be moved, usually its range of flexion and extension. *See* Med Terms Medical Dictionary, http://www.medterms.com/script/main/art.asp?articlekey=5208 (last visited July 13, 2007).

[9] Plaintiff continued chiropractic treatment with Dr. Merckling on 14 occasions until April 16, 2004. *Id*. at 427-39. Dr. Merckling's assessment remained unchanged from his initial diagnosis throughout plaintiff's treatments. *Id.* Acupuncturist Hong Zhu Wu also examined plaintiff on November 19, 2003, and observed muscle spasms and tenderness throughout the plaintiff's neck, shoulders, middle back, rib cage/sternum, and lower back. *Id*. at 235. Wu recommended weekly acupuncture treatments to alleviate patient's pain and to prevent any further progression of the disability. *Id*. at 237. Wu's records indicate that plaintiff received 18 treatments between November 2003 and April 2004. *Id*. at 265-270.

observed tenderness in plaintiff's thoracic spine, lumbar spine, and shoulders.  Plaintiff's lower extremities had full range of motion and his reflexes and sensation were intact.  *Id.* at 226. A straight leg test was positive on the right side at 35 degrees.[10]  *Id.* at 372.  Plaintiff's Spurling's Test was also positive.[11]  *Id.* at 371.

Dr. McGee diagnosed 12 conditions including post-traumatic thoracic, cervical, and lumbar strain/sprain.  *Id.* at 373.  He recommended physical therapy, acupuncture, chiropractic treatment and follow-up diagnostic tests.  *Id.* at 375.  Dr. McGee concluded that plaintiff's symptoms were consistent with radiculopathy[12] and opined that plaintiff was completely disabled.  *Id.* at 227-28.  He recommended that plaintiff begin physical therapy and prescribed a cervical collar, lumbar support and heat pads.  *Id.*

On December 16, 2003, Dr. McGee conducted a computer-assisted range of motion examination.  *Id.* at 376-90.  Each test,

---

[10] Straight leg raising, also known as a Lasègue test, is a means of diagnosing nerve root compression, which can be caused by a herniated disc. The patient lies flat while the physician raises the extended leg.  If the patient feels pain in the back at certain angles (a "positive test"), the pain may indicate herniation.  Herniation is when a disc, the soft tissue between vertebrae, protrudes from its normal position, thereby pressing on the nerves and causing pain.  *See Stedman's* at 814; *see also* Medical Dictionary - Straight-leg Raising Test, http://www.medilexicon.com/medicaldictionary.php/ php?t=90845 (last visited July 1, 2009).

[11] A positive Spurling's Test indicates a nerve root pathology, stimulation of existing nerve root irritation or other problems related to disc disease or lesion of the spine of a degenerative nature.  *See* Shaw Chiropractic Group, Information for Attorneys - Exam Glossary, http://www.shawchiropractic.com/attorneys/MORE_glossary.htm (last visited July 1, 2009); *see also Stedman's* at 1678.

[12] Disorder of the spinal nerve roots.  *See Stedman's* at 1503.

in each subcategory of the cervical and lumbar spine, revealed abnormal results. *Id.* Dr. McGee concluded that plaintiff suffered from a 35 percent impairment. *Id*. at 389. Plaintiff returned to Dr. McGee's office the following day for an x-ray examination of the spine. *Id*. at 204-05. Interpreting the x-ray, Dr. McGee observed spinal abnormalities including mild osteophyte formation,[13] moderate lumbar scoliosis at 10 degrees,[14] and irregular spinal curvature. *Id.* Dr. McGee further recommended that plaintiff begin biofeedback treatment to facilitate recovery and to control pain and muscle spasms.[15] *Id*. at 197.

That same day, interpreting an MRI of plaintiff's lumbar spine, Dr. McGee observed moderate disc herniation[16] and

---

[13] A bony outgrowth or protuberance. *See Stedman's* at 1285.

[14] Scoliosis is a disorder that causes an abnormal curve of the spine, or backbone. People with scoliosis develop additional curves to either side of the spine, and the bones of the spine twist on each other like a corkscrew. *See* Medicine Net, Diseases & Conditions - Scoliosis, http://www.medicinenet.com/scoliosis/article.htm (last visited July 1, 2009).

[15] Biofeedback treatment is a method of treatment that uses monitors to feed back to patients physiological information of which they are normally unaware. By watching the monitor, patients can learn by trial and error to adjust their thinking and other mental processes in order to control 'involuntary' bodily processes. Biofeedback is used to treat a wide variety of conditions and diseases including muscle spasms, partial paralysis, or muscle dysfunction caused by injury. *See* Medicine Net, Definition of Biofeedback, http://www.medterms.com/script/main/art.asp?articlekey=10810 (last visited July 15, 2009).

[16] The spinal discs are soft cushions that rest between the bones of the spine, the vertebrae. When a disc is damaged, it may herniate, or push out, against the spinal cord and spinal nerves. This pressure on the spinal cord and nerves can produce pain in the back and limbs. *See* Medicine Net, Degenerative Disc Disease & Sciatica, http://www.medicinenet.com/ degenerative_disc/article.htm (last visited July 2, 2009).

straightening of the lumbosacral spine due to muscle spasm. *Id.* at 182. A December 29, 2003 MRI of the plaintiff's shoulder interpreted by Dr. McGee revealed a small amount of joint effusion[17] and moderate swelling around the shoulder joint. *Id.* at 181. On an MRI taken January 6, 2004, Dr. McGee observed straightening of the cervical spine and a generalized bulge of the thecal sac of the spine.[18] *Id.* at 180.

On January 30, 2004, plaintiff was again evaluated by Dr. McGee. *Id.* at 189. Plaintiff complained of continual neck, back and shoulder pain. *Id.* Dr. McGee's examination showed decreased range of motion and tenderness in the spine and affected extremities, as well as muscle spasms. *Id.* at 189, 354. Spurling's Test and straight leg test were positive. *Id.* Dr. McGee prescribed a Transcutaneous Electrical Nerve Stimulation ("TENS") unit,[19] a whirlpool, massager, car seat, and Robaxin, a pain reliever. *Id.* at 190. Dr. McGee also ordered a somatosensory study ("SSEP") and an electromyography ("EMG")

---

[17] The escape of fluid from the blood vessels or lymphatics into the tissues or a cavity. *See Stedman's* at 570.

[18] The thecal sac protects the dangling nerve roots of the spine. Basic Disk Anatomy, http://www.chirogeek.com/000_Disc_Anatomy.htm (last visited July 2, 2009).

[19] TENS units are small devices that are battery controlled. Electrode patches are attached to the skin, and small electrical impulses are delivered to underlying nerve fibers to control pain. Health Central - TENS Unit for Pain, http://www.healthcentral.com/chronic-pain/treatment-36204-5.html (last visited August 7, 2009).

test,[20] which returned normal results. *Id*. at 191.

On April 15, 2004, Dr. McGee issued an "intermediate report" summarizing plaintiff's treatment to date, including chiropractic, acupuncture, physical therapy, and diagnostic testing. *Id*. at 169-79. Dr. McGee noted that plaintiff had failed to achieve a full recovery and opined that he had a permanent restriction in function and ability to perform daily activities. *Id*. at 354-55.

Dr. McGee issued "Disability Certificates" on October 13, 2004 and October 20, 2004, indicating that plaintiff had been "totally incapacitated" since November 13, 2003 due to cervical and lumbar strain. *Id*. at 168.

On December 17, 2004, Dr. McGee examined plaintiff for continuous complaints of neck and back pain. *Id*. at 166-67. Dr. McGee noted that plaintiff's daily activities continued to be affected due to pain, and that plaintiff was taking pain medications, Naprosyn and Flexeril. *Id*. at 166. Plaintiff continued to have muscle spasms and restriction in motion of the spine. *Id.* Dr. McGee opined that plaintiff was unable to work

---

[20] SSEP is a test showing the electrical signals of sensation going from the body to the brain. An SSEP indicates whether the spinal cord or nerves are being pinched. It is helpful in determining how much the nerve is being damaged and if there is a bone spur, herniated disc, or other source of pressure on the spinal cord or nerve roots. A SSEP test is usually combined with an EMG, a test of how well the nerve roots leaving the spine are working. EMG is used to show if a nerve is being irritated or pinched as it leaves the spine on its way down the arm or leg. *See* All About Back Pain - Diagnostic Testing, http://www.allaboutbackpain.com/html/spine_diagnostics/ spine_diagnostics_ssep.html (last visited August 7, 2009).

due to pain and that his disability had lasted for 12 months.
*Id.*

Dr. McGee also completed a spinal impairment questionnaire
provided by plaintiff's attorney. *Id*. at 159-65. He noted that
plaintiff had daily neck and back pain due to cervical, lumbar
and right shoulder sprain, spinal disc herniation, and disc
bulge.[21] *Id*. at 159. In support of his diagnosis, Dr. McGee
cited his clinical findings during plaintiff's treatment. *Id*. at
160-61. With respect to plaintiff's residual functional capacity
("RFC"),[22] Dr. McGee stated that plaintiff could sit for less
than one hour and stand/walk for less than one hour in an eight-
hour workday. *Id*. at 162. He also noted that plaintiff would
have to move around every 15 minutes, was unable to lift or carry
five pounds, and incapable of handling even low stress. *Id*. Dr.
McGee opined that plaintiff was unable to perform a full-time
competitive job requiring activity on a sustained basis. *Id*. He
concluded that plaintiff needed to avoid humidity, heights, and
was incapable of pushing, pulling, kneeling, bending or stooping.

---

[21] A bulging disc is an example of a contained disc disorder, which
remains contained and may be a precursor to a herniated disc, a non-contained
disc disorder that is partially or completely broken open. Spinal Universe -
Herniated and Bulging Disks, http://www.spineuniverse.com/displayarticle.php/
article437.html (last visited August 7, 2009).

[22] Residual Functional Capacity ("RFC") is an assessment of plaintiff's
ability to do work activities despite his or her limitations, defined by the
SSA as follows: "Your impairment(s), and any related symptoms, such as pain,
may cause physical and mental limitations that affect what you can do in a
work setting. Your residual functional capacity is what you can still do
despite your limitations." 20 C.F.R. § 416.945(a).

*Id*. at 165.

Interpreting a December 20, 2004 MRI of plaintiff's left ankle, Dr. McGee observed a small joint effusion and made other findings consistent with a potential partial tear of the muscles of the foot. *Id*. at 155.

Plaintiff's next visit with Dr. McGee was six months later on June 5, 2005. *Id*. at 157-58. Plaintiff continued to complain of pain in the neck, back, and right knee and heel, and had muscle spasms and restriction of motion of the spine. *Id*. at 157. Dr. McGee's clinical findings were substantially the same as those found on December 17, 2004. *Id.*

Interpreting an MRI of plaintiff's lumbar spine taken on July 28, 2005, Dr. McGee observed disc herniation, diffuse disc bulge and threadlike prolongation of the spinal cord. *Id*. at 456.

## ii. 2003-2005 Findings Of Dr. Giovanni Marciano, Treating Family Practitioner

Dr. Marciano began treating plaintiff on May 12, 2003 and continued through August 2005, during which period he saw plaintiff three times a year.[23] *Id*. at 283. On September 12, 2005, Dr. Marciano completed a Multiple Impairment Questionnaire at the request of plaintiff's counsel. *Id*. at 283-90. Dr.

---

[23] Details of plaintiff's visits from 2003 to early 2005 are absent from the record.

Marciano diagnosed plaintiff with, *inter alia*, herniated lumbosacral disc "according to patient." *Id*. at 283. He also noted that plaintiff had decreased range of motion of the spine, and experienced heel and lumbosacral pain daily. *Id*. at 284-85. As to plaintiff's RFC, Dr. Marciano stated that plaintiff could sit for two hours and could stand/walk for two hours in an eight-hour day. *Id*. at 285. He also stated that plaintiff had to get up and move around each hour, and that plaintiff could lift or carry only ten pounds. *Id*. at 286. Dr. Marciano further opined that plaintiff was disabled and that his symptoms would increase in a competitive work environment and frequently interfere with attention and concentration. *Id*. at 287-88. He also opined that plaintiff was capable of managing a low level of work stress. *Id*. at 287-88.

### iii. 2005 Findings Of Dr. Steven Calvino, Consultative Examiner

On August 4, 2005, Dr. Calvino examined plaintiff at the SSA's request following plaintiff's June 2005 application for disability benefits. *Id*. at 279-82. Plaintiff reported that he experienced lower back pain which radiated to his lower extremities, tingling in his left great toe, and that his pain worsened by prolonged sitting, standing or walking. *Id*. at 279. Dr. Calvino noted that plaintiff's gait was slightly antalgic

with weight bearing on the right leg,[24] and that plaintiff had
decreased range of motion in the lumbar spine, and tenderness and
muscle spasms in the lumbar spine. *Id.* at 280. Plaintiff used
no assistive device, and did not need help changing or getting on
and off the examination table. *Id.* at 280. Straight leg raising
test was negative. *Id.* at 281. According to Dr. Calvino,
plaintiff had full range of motion of the upper extremities, no
sensory abnormalities, and no muscle atrophy. *Id.* at 280. In
the thoracic and lumbar spine, plaintiff had limited flexation,
mild muscle spasm, and positive tenderness. *Id.* Dr. Calvino
diagnosed lumbrosacral radiculopathy. *Id.* at 281. He opined
that plaintiff was moderately limited for heavy lifting,
prolonged standing, walking, and bending, and had no restriction
on fine motor activities of the upper extremities. *Id.*

**B. Medical Evidence Relating To Second Car Accident**

On September 5, 2006, plaintiff was involved in another
motor vehicle accident. *Id.* at 307. His vehicle was hit in the
rear and his head collided with the interior of the car. *Id.* At
the time of the impact, plaintiff was dazed and shocked but did
not lose consciousness. *Id.* Plaintiff experienced neck and back
pain immediately and was taken to the emergency room at Jamaica

---

[24] A characteristic gait adopted so as to avoid pain on weight-bearing
structures, in which the stance phase of the gait is shortened on the affected
side. *See Stedman's* at 722.

Hospital, where he was examined and discharged. *Id.*

### i. 2006-2008 Findings Of Dr. McGee, Treating Physician

On September 13, 2006, plaintiff returned to Dr. McGee at
Advanced Medical Rehabilitation P.C. *Id*. at 307. He complained
of insomnia, neck pain and stiffness, middle and lower back pain,
difficulty rising after prolonged sitting, and difficulty
standing, walking and bending. *Id.* Plaintiff reported taking
Voltaren, an anti-inflammatory drug used to treat pain and
inflamation caused by musculoskeletal impairments. *Id.* Dr.
McGee noted that plaintiff appeared to be in moderate distress
and that his gait was antalgic due to lower back pain. *Id.* at
308. Examination revealed muscle spasm and tenderness of the
thoracic spine and paravertebral musculature, reduced range of
motion in the cervical and lumbosacral spine with extremes of
motion. *Id.* Spurling's Test and straight leg testing of both
legs were positive. *Id.*

Dr. McGee diagnosed post-traumatic cervical, thoracic and
lumbar sprain, right and left shoulder sprain, and possible
cervical and lumbar radiculopathy and disc syndrome and possible
rotator cuff tear. *Id.* at 309. He recommended physical therapy,
biofeedback therapy, acupuncture, chiropractic treatment and
follow-up diagnostic and range of motion tests. *Id.* Dr. McGee
also stated that further x-rays, an electrocardiogram, and an MRI

of the spine were required to ascertain the extent of plaintiff's injuries. *Id.* Dr. McGee preliminarily concluded that plaintiff was suffering from symptoms consistent with musculoskeletal injuries and opined that he remained impaired and completely disabled. *Id.* at 311.

Dr. McGee's interpretation of a September 27, 2006 MRI of plaintiff's cervical spine showed straightening of the cervical lordosis[25] and central disk herniation. *Id.* at 320. A reading of an October 5, 2006 MRI of plaintiff's lumbar spine revealed lipoma,[26] loss of signal,[27] and herniation. *Id.* at 321.

On December 6, 2006, Dr. McGee completed a second spinal impairment questionnaire provided by plaintiff's attorney. *Id.* at 469-74. He noted that plaintiff still experienced sharp pain in his neck and mid-to-lower back daily, which was precipitated by standing, sitting and walking. *Id.* at 471. Dr. McGee diagnosed plaintiff with cervical and lumbar disc herniation and radiculopathy. *Id.* at 469. He cited his clinical finding of limited range of motion, muscle tenderness, spasms and weakness, and positive straight leg tests, as well as MRI results showing

---

[25] Cervical lordosis is the normal, convex curvature of the cervical segment of the vertebral column. *See Stedman's* at 1032.

[26] A benign tumor of tissue, composed of mature fat cells. *Stedman's* at 1021.

[27] Disk degeneration of the spine is characterized by loss of signal intensity best seen by an MRI. Wheeless' Textbook of Orthopaedics, MRI of the Spine, http://www.wheelessonline.com/ortho/mri_of_the_spine (last visited August 7, 2009).

cervical and lumbar herniated disks.  *Id*. at 469-71.  With
respect to plaintiff's RFC, Dr. McGee opined that plaintiff could
sit for less than one hour and stand/walk for less than one hour
in an eight-hour workday.  *Id*. at 472.  He also noted that
plaintiff could never lift or carry any weight and should not
push, pull, kneel, bend or stoop.  *Id*. at 472-73, 475.

On February 7, 2007, Dr. McGee issued an "intermediate
report," which included the initial report dated September 13,
2006, as well as follow-up examinations and consultations
recapping plaintiff's treatment with an acupuncturist, a
chiropractor, and biofeedback and physical therapy.  *Id*. at 292-
97, 301.  The report also included treatment notes from Dr.
McGee's examinations on October 11, November 15, and December 13,
2006, and January 10, 2007.  *Id*. at 298-300.  At each re-
evaluation, plaintiff continued to complain of back and neck
pain.  *Id.*  Dr. McGee prescribed Ambien and Voltaren.  *Id*. at
299.  He noted that plaintiff had not achieved a full recovery
and concluded that he had a total permanent restriction in
function and ability to perform daily activities.  *Id*. at 302.

On July 9, 2008, Dr. McGee completed a narrative report
detailing his prior treating relationship with the plaintiff.
*Id*. at 478-79.  Dr. McGee stated that plaintiff suffered from
cervical and lumbar disc herniation with radiculopathy, a
conclusion supported by the results of plaintiff's MRIs, EMG

testing and physical examinations. *Id.* Further, Dr. McGee noted plaintiff's limited range of motion, tenderness on palpation, muscle spasm, weakness, abnormal gait, and positive straight leg raise tests. *Id.* Dr. McGee concluded that plaintiff was totally disabled and has been unable to work since November 15, 2003. *Id.*

**ii. 2006 Findings Of Dr. Richard W. Johnson, Neurological Surgeon, And 2006-2007 Findings Of Dr. Carlisle St. Martin, Treating Neurologist**

Plaintiff was examined by Dr. Richard Johnson on November 27, 2006. *Id.* at 322. Plaintiff complained of weakness and numbness in his right leg, neck pain and lower back pain. *Id.* Dr. Johnson reviewed the September and October 2006 MRIs of plaintiff's cervical and lumbar spine and concluded that both injuries were "non-surgical in nature" at the time of examination. *Id.* He opined that, because the MRIs did not reflect the amount of pain the plaintiff experienced, there might be nerve damage. *Id.* He also referred plaintiff to a neurologist, Dr. Carlisle St. Martin.[28]

On November 28, 2006, plaintiff had an initial consultation

---

[28] On December 18, 2006, plaintiff was re-evaluated by Dr. Johnson. *Id.* at 319. Plaintiff continued to complain of pain radiating to his legs and weakness. *Id.* Dr. Johnson reviewed a November 29, 2006 MRI, which showed a large herniated disk compressing the nerve root at the right side. *Id.* He noted that the compression was occurring on the side most likely consistent with plaintiff's complaints and recommended surgery. *Id.* At that time, plaintiff declined surgery. *Id.*

with Dr. St. Martin. *Id*. at 329. After examining MRI results, Dr. St. Martin diagnosed herniation of the spine. *Id.* He performed an EMG of the lower extremities which revealed spinal radiculopathy. *Id.* at 330. Dr. St. Martin concluded that plaintiff was totally disabled. *Id.* at 329.

Plaintiff revisited Dr. St. Martin on December 6, 2006, December 18, 2006, January 10, 2007 and January 17, 2007 with similar complaints, findings and diagnoses. *Id*. at 324-28. Dr. St. Martin continued to opine that plaintiff was totally disabled. *Id.*

### iii. 2007 *Findings Of Dr. Leon Sultan, Examining Orthopedic Surgeon*

On May 9, 2007, plaintiff was evaluated by Dr. Leon Sultan, who wrote a summary report at plaintiff's attorney's request. *Id*. at 331-40. Dr. Sultan examined plaintiff and reviewed the MRI testing and nerve conduction studies from the fall of 2006. *Id*. He concluded that plaintiff was suffering from low-grade cervical spine myofascitis[29] with underlying cervical disc herniation and chronic lower back pain with lower lumbar disc herniation. *Id*. at 333. Dr. Sultan opined that plaintiff had a permanent lumbar spine orthopedic impairment that would prevent him from engaging in gainful employment. *Id*.

---

[29] Inflamation of a muscle through an interstitial growth of fibrous tissue. *Stedman's* at 1176, 1173.

Dr. Sultan also completed a lumbar spine impairment questionnaire provided by plaintiff's counsel. *Id*. at 334. With respect to plaintiff's RFC, Dr. Sultan concluded that plaintiff could sit for two to three hours and stand or walk for two to three hours in an eight-hour work day. *Id*. at 336. He also opined that plaintiff could never lift or carry more than five pounds and could never push, pull, kneel, bend or stoop. *Id*. at 337-39. Dr. Sultan concluded that plaintiff would need to get up hourly for 15 minutes, would need unscheduled breaks every hour to rest, and that his symptoms would frequently interfere with his attention and concentration. *Id*. He further concluded that plaintiff's symptoms and limitations applied since September 5, 2006, and also since November 15, 2003. *Id*. at 339.

### iv. 2008 Opinion of Dr. Louis Lombardi, SSA Medical Expert

Dr. Louis Lombardi was called by the ALJ at the February hearing to testify as a medical expert.[30] *Id*. at 517-66. Dr. Lombardi's testimony was based on his review of the medical record and plaintiff's testimony. *Id*. He was aware of the findings of Dr. McGee, Dr. Sultan, Dr. Johnson and Dr. St. Martin and found them inconsistent with the medical evidence. *Id*.

---

[30] At the first hearing on January 14, 2008, Dr. Lombardi did not have the complete record with him nor had he reviewed the record at that time. Therefore, the ALJ ordered a continuance for a supplemental hearing on Feburary 13, 2008. Tr. at 556-66.

Dr. Lombardi criticized several of Dr. McGee's testing methods. He stated that somatosensory tests[31] were not typically used as a diagnostic tool, that computerized range of motion muscle tests had no validity in the medical community, and that the two MRI results were clinically insignificant. Dr. Lombardi noted that Dr. McGee's evaluations used boilerplate forms[32] and constituted "nothing more than a check-off list" and were not determinative. *Id*. at 484. He also testified that he was "flabbergasted" by Dr. McGee's RFC assessment and stated that Dr. McGee should be contacted to explain his findings. *Id*. at 491.

Dr. Lombardi testified that Dr. Sultan's medical records were ambiguous because his clinical findings were not supported by the MRI results regarding plaintiff's spine. *Id*. at 495. He also criticized other findings by Dr. Sultan, including a negative straight leg test, as in conflict with Dr. McGee's assessment. *Id.* Dr. Lombardi also opined that Dr. Sultan's relatively mild clinical findings did not support his assessment that plaintiff could not perform gainful employment. *Id*. at 546.

Dr. Lombardi also took note of Dr. Johnson's comment that

---

[31] Somatosensory tests study the relay of body sensations to the brain and how the brain receives those sensations. Recording electrodes are placed on the spine and the test evaluates the health of a patient's peripheral nerves and spinal cord. University of Iowa - Department of Neurology, Health Topics, http://www.uihealthcare.com/topics/medicaldepartments/neurology/septest/index.html (last visited August 7, 2009).

[32] Dr. Lombardi testified that Dr. McGee used boilerplate forms on multiple evaluations, where the doctor "circles areas that he feels pertain to this particular patient." Tr. at 484.

plaintiff's MRI did not reflect the amount of pain that plaintiff reported. *Id*. at 497-98. Further, he criticized Dr. Johnson for recommending surgery on the basis of the MRI without examination and for describing plaintiff's herniation as "large" when that term had not been used by the radiologist reading the MRI. *Id*. According to Dr. Lombardi, Dr. St. Martin's assessments of plaintiff's range of motion were quantified in values typically used to measure muscle weakness and not planes of motion. *Id*. at 513. Dr. Lombardi concluded that, based on his review of the medical records, plaintiff should have no difficulty sitting or standing for a prolonged period of time. *Id*. at 515.

## DISCUSSION

### I.    Standard of Review

A court reviewing a decision of the Commissioner must determine whether the Commissioner of Social Security applied the correct legal standards, and whether his conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Green-Younger v. Barnhart*, 335 F.3d 99, 105 (2d Cir. 2003) (quoting *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir.

2004) (*per curiam*) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). An evaluation of the "substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir. 1988).

If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld. *See* 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). However:

> although factual findings by the Commissioner are "binding" when "supported by substantial evidence," "[w]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual finding of the ALJ. Failure to apply the correct legal standards is grounds for reversal."

*Pollard v. Halter*, 377 F.3d 183, 188-189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). In addition, a district court reviewing the Commissioner's decision should bear in mind that the Act is "a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion." *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983) (quoting *Marcus v. Califano*, 615 F.2d 23, 29 (2d Cir. 1979)).

## II.  Statutory and Regulatory Framework

The Social Security Act defines "disability" in relevant
part as the "inability to engage in any substantial gainful
activity[33] by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).
Further, a person will be determined to have a disability "only
if his physical or mental impairment or impairments are of such
severity that he is not only unable to do his previous work but
cannot, considering his age, education, and work experience,
engage in any other kind of substantial gainful work which exists
in the national economy[.]"  42 U.S.C. §§ 423(d)(2)(A).

Regulations promulgated by the Social Security Commissioner
set forth a five-step process to determine whether an impairment
or impairments demonstrate disability.  The Second Circuit has
described the five-step process as follows:

> First, the [Commissioner] considers whether the claimant
> is currently engaged in substantial gainful activity.  If
> he is not, the [Commissioner] next considers whether the
> claimant has a "severe impairment" which significantly
> limits his physical and mental ability to do basic work
> activities.  If the claimant suffers such an impairment,
> the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed
> in Appendix 1 of the regulations.  If the claimant has
> such an impairment, the [Commissioner] will consider him
> disabled without considering vocational factors such as

---

[33] "Substantial gainful activity" is defined as work that involves "doing
significant and productive physical or mental duties" and "[i]s done (or
intended) for pay or profit." 20 C.F.R. § 404.1510; *see also* 20 C.F.R. §
404.1572.

age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted) (brackets in original); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); 20 C.F.R. § 404.1520(a)(4)(I-v).

The claimant bears the burden of demonstrating that he meets all requirements for benefits. 42 U.S.C. § 423(d)(5)(A). However, at step five of the analysis, the burden shifts to the Commissioner to show that the claimant can perform other substantial, gainful work available in the national economy. *Carroll v. Sec'y*, 705 F.2d 638, 642 (2d Cir. 1983); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

The ALJ has an affirmative duty to investigate and develop the facts and arguments both for and against the granting of benefits. *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ("the ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceeding.") (internal quotations omitted); *see also Vega v. Astrue*, No. 08-CV-1525, 2009 WL 961930, at *3 (S.D.N.Y. April 6, 2009) ("[I]t is well settled that the ALJ has an affirmative duty to develop the

record in a disability benefits case and that remand is appropriate where this duty is not discharged.").

In evaluating medical source opinions, the "treating physician rule" established by SSA regulations mandates that "the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also* 20 C.F.R. § 404.1527(d)(2).[34] Thus, if a treating physician's opinion is either not well supported by medically acceptable clinical and laboratory diagnostic techniques or inconsistent with other substantial evidence in the record, it need not be afforded controlling weight. However, "[e]ven if the treating physician's opinion is contradicted by substantial evidence and thus is not controlling, the opinion is still entitled to significant weight." *Moore v. Astrue*, No. 07-cv-5207, 2009 WL 2581718, at *9 (E.D.N.Y. Aug. 21, 2009) (citation omitted).

Where a treating physician's opinion is not accorded

---

[34] 20 C.F.R. § 416.927(d)(2) provides: "Generally, we give more weight to opinions from your treating sources . . . [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion." 20 C.F.R. § 416.927(d)(2). "Treating source" is defined as a claimant's "own physician, psychologist, or other acceptable medical source who provides . . . or has provided . . . medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). These factors include "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist[,]" and other factors which tend to support or contradict the opinion. *Shaw*, 221 F.3d at 134; 20 C.F.R. § 404.1527(d)(2)-(6). Given the ALJ's duty to develop the record *sua sponte*, he may not reject a treating physician's opinion based on a lack of clear medical evidence or inconsistency without first attempting to fill the gaps in the administrative record. *See Rosa*, 168 F.3d at 79 (citing *Schaal*, 134 F. 3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*.")); *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly.").

Further, when according the treating physician's opinion less than controlling weight, the ALJ must also set forth "good reasons" for his determination. 20 C.F.R. § 404.1527(d)(2); 20

C.F.R. §416.927(d)(2). "If the ALJ fails to provide good reasons for affording less than controlling weight to the treating physician, or fails to properly consider the factors under the regulations, it is grounds for remand." *Moore*, 2009 WL 2581718, at *9; *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (internal quotation marks and citations omitted).

### III. The ALJ's Determination of Disability Under the Social Security Act

Using the sequential evaluation process, here, the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability, November 15, 2003. Tr. at 23. At step two, the ALJ found that plaintiff suffered from a severe impairment of the musculoskeletal system. *Id*. at 31. At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that qualified him as being 'per se' disabled. *Id.* The ALJ then assessed plaintiff's residual functional capacity at step four, finding that, based on the objective evidence, plaintiff was able to sit without limitation, stand or walk for up to six hours in an eight-hour day, and lift or carry between 10 and 20 pounds. *Id*. at 33. Based on this assessment, the ALJ determined that plaintiff retained the capacity to perform more than the full range of sedentary work and less than the full range of light

work,[35] that he was able to return to his past relevant work as a parking attendant, and accordingly, that he was not disabled.[36] *Id.* at 38.

In making his determination, the ALJ gave little if any weight to the medical opinions of Drs. McGee, Marciano, and St. Martin, which he found lacking in evidentiary support and inconsistent with other evidence in the record. *Id.* at 36-37. The ALJ also determined that plaintiff's subjective complaints of the "intensity, persistence and limiting effects" of his pain were not credible and "disproportionate to the record" as there were no "findings on physical examination" or "results of

---

[35] Federal regulations define sedentary work as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a). Federal regulations define light work as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking and standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. §404.1567(b)

[36] Despite his finding of no disability at step four, the ALJ proceeded to the step-five inquiry whether, assuming plaintiff could not perform his past work, there existed any work in the national economy that plaintiff could perform. The ALJ listed the factors he must consider in making his step-five determination pursuant to the Medical-Vocational Guidelines, but then simply concluded, without analysis, that, considering "the claimant's RFC, age, education, and transferable work skills, a finding of 'not disabled'" was appropriate. *Id.* at 38. In any event, the ALJ did not rely on this step-five analysis in concluding that plaintiff was not disabled.

diagnostic testing" to support plaintiff's claims.  *Id*. at 31-34.


## IV.  Analysis

Plaintiff argues that the ALJ failed to apply correct legal standards in rejecting the opinions of his treating physicians, Drs. McGee, Marciano, and St. Martin.[37]  A review of the statutory factors the ALJ was required to consider in rejecting plaintiff's treating physicians' opinions persuades me that in his decision, the ALJ did not adequately set forth "good reasons" for his determination.


### A. Length, Extent, And Nature Of The Treatment Relationships

In determining whether to accord great or controlling weight to a treating physician, an ALJ must first consider the length of the treatment relationship and frequency of the examination, as well as the nature and extent of the treatment relationship. *Halloran*, 362 F.3d at 32.  Here, while the ALJ described when and

---

[37] Plaintiff further argues that in the ALJ's decision, the ALJ improperly found that plaintiff was not disabled pursuant to "Medical-Vocation Rule 202.24," which does not exist. *See* Tr. 38.  The Commissioner concedes that the ALJ erred in citing this non-existent rule, but claims that this mistake was merely a typographical error. Def. Br. at 28.  Where a discrepancy is found in an ALJ's decision, if it is obvious from the opinion as a whole that the error is typographical, the error is harmless. *Taveras v. Barnhart*, No. 06-CV-977, 2007 WL 1519317 at *3 n.2 (E.D.N.Y. May 25, 2007) (concluding that where an ALJ, in making a finding, cited a statutory provision that did not exist, but where the ALJ's finding was consistent with the entire record, the Court assumes that the ALJ's citation was a harmless typographical error).  Considering the ALJ's decision as a whole, I find that there is no factual ambiguity as to the ALJ's determination.  A reading of the disputed portion of the ALJ's decision in context reveals the ALJ's citation to a non-existent rule to be a typographical mistake and not a substantive error.  Accordingly, plaintiff's contention is without merit.

how often plaintiff was seen by his treating physicians during his recitation of the facts, *see* Tr. 24-28, 31-33, he failed to take the length or the nature of those treatment relationships into account in his analysis. This factor is particularly significant with regard to Dr. McGee, who appears to have had the most substantial treatment relationship with plaintiff of any of the physicians of record regarding plaintiff's allegedly disabling impairments, and whose treatment of plaintiff spanned at least three years.[38] While the ALJ drew adverse inferences from apparent gaps in plaintiff's treatment with Dr. McGee, he failed to take into account the overall length and nature of the treatment relationship between Dr. McGee and plaintiff in determining how much weight to accord Dr. McGee's opinion.

## B. Evidence Supporting The Treating Physicians' Opinions

An ALJ must also consider the extent to which a treating physician's opinion is supported by medical and laboratory findings. *Halloran*, 362 F.3d at 32. However, "[i]n the absence of supporting expert medical opinion, the ALJ should not . . .

---

[38] Futher, it is worth noting that the ALJ incorrectly found that there was "no record that any treatment relationship existed between Dr. McGee and [plaintiff] after December 2006." Tr. 32. In fact, a report prepared by Dr. McGee on February 7, 2007 reveals that Dr. McGee examined plaintiff at least once after December 2006, notably on January 10, 2007. *Id.* 299-300. Dr. McGee also completed a narrative report on plaintiff's behalf on July 9, 2008; however, the report does not set forth in detail the frequency of plaintiff's treatment with Dr. McGee, and it is silent as to whether treatment was ongoing at that time.

engage[] in his own evaluations of the medical findings."
*Filocomo v. Chater*, 944 F.Supp. 165, 170 (E.D.N.Y. 1996). While
an ALJ "is free to resolve issues of credibility . . . or to
choose between properly submitted medical opinions, he is not
free to set his own expertise against that of a physician who
submitted an opinion to or testified before him." *Balsamo v.
Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotations
omitted); *see also Shaw*, 221 F.3d at 134 ("Neither the trial
judge nor the ALJ is permitted to substitute his own expertise or
view of the medical proof for the treating physician's opinion.")

Here, the ALJ correctly reviewed the medical and laboratory
findings of plaintiff's treating physicians. However, he appears
to have engaged in an impermissible evaluation of those findings
based on his own judgment. Tr. 36-37. With regard to Dr. McGee,
the ALJ stated that Dr. McGee's opinion that plaintiff was unable
to work due to pain was "inconsistent with diagnostic test
results (MRI, NCVS/EMG, SSEP), as well as the conservative nature
of the treatment Dr McGee provided." Tr. 36. He did not set
forth the basis for this conclusion. The ALJ further stated that
Dr. McGee's opinion that plaintiff retained the residual
functional capacity for less than the full range of sedentary
work was "inconsistent with the results obtained on diagnostic
testing," and "inconsistent with Dr. McGee's reported findings,
including full extremity motor power, and no established

disturbance of sensation or reflexes." *Id.* Similarly, he
provided no basis in medical opinion or expert testimony for this
conclusion. Nor is there any evidence that he took Dr. McGee's
other findings -- for instance, that plaintiff suffered from
diminished range of motion and diminished sensation, muscle
spasms, an inability to straight leg raise, disc herniations,
spinal abnormalities, and possible radiculopathy, *see* Tr. 227-28,
308-09 -- into account in concluding that Dr. McGee's opinion
lacked medical support. Further, the ALJ stated that if Dr.
McGee's view that plaintiff could sit, stand and/or walk for no
more than 1 hour in an 8 hour day were true, plaintiff "would
also have had to have had abnormalities that were not detected
such as severe loss of sensation and motor power, as well as
impaired deep tendon reflexes." *Id.* at 37. Here again, the ALJ
did not refer to medical evidence or expert testimony supporting
his conclusion. While it is possible that in reaching these
conclusions, the ALJ relied on the view of medical expert Dr.
Lombardi that Dr. McGee's "opinion is without corroboration," *see*
Tr. 30, I am unable to deduce from the ALJ's decision whether
this was, in fact, the case.[39]

_____

[39] Further, while the ALJ's decision does not reveal whether the ALJ
relied on Dr. Lombardi's expert opinion in determining how much weight to
accord the opinions of plaintiff's treating physicians, I note that Dr.
Lombardi's own assessments of plaintiff are entitled to little if any weight.
*See Filocomo v. Chater*, 944 F.Supp. 165, 170 n.4 (E.D.N.Y. 1996). As a non-
examining medical expert, Dr. Lombardi's testimony was based on his review of
the record and collected medical evidence. His job was "to explain complex
medical problems in terms understandable to lay examiners," *Vargas v.*

Similarly, the ALJ found that "Dr. St. Martin's opinion is . . . lacking in evidentiary support in the form of clinical findings," Tr. at 36, but did not refer to expert testimony supporting this conclusion. As with his evaluation of the evidence supporting Dr. McGee's opinions, it is possible that the ALJ relied on Dr. Lombardi's opinion that Dr. St. Martin's reports did "not adequately provid[e] a longitudinal evaluation of the claimant," that they "failed to quantify matters," and further, that they "contained normal results on neurological evaluation such as normal sensation and reflexes," *see* Tr. at 30, but the ALJ's decision is silent as to whether this medical opinion was actually the basis for his conclusion. Further, the ALJ found that Dr. St. Martin's findings were "internally inconsistent," apparently because Dr. St. Martin noted that prior to September 2009, plaintiff was "working full duty" and lost his job over a disagreement with his employer, not for medical reasons. However, in light of the fact that plaintiff was involved in a second car accident in September 2006, Dr. St. Martin's opinion that plaintiff was disabled following the second accident in November and December of 2006 is not necessarily

---

*Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990), not to assess plaintiff's impairments. Thus, while is proper for the ALJ to rely on Dr. Lombardi's opinion concerning the adequacy of plaintiff's treating physicians' testing methods, as well as whether the treating physicians' findings adequately support their opinions, it is improper for the ALJ to accord more weight to Dr. Lombardi's medical assessment of plaintiff than to the assessments of physicians having actually examined plaintiff.

inconsistent with his observation that plaintiff was working in September 2006, prior to the second accident.

With regard to Dr. Marciano, the ALJ correctly noted that Dr. Marciano's "'report' contains almost no clinical findings[.]" Tr. 36. In fact, the sole document in the record relating to Dr. Marciano's treatment of plaintiff from 2003-2005 is a fairly cursory report prepared on September 12, 2005. The report states that Dr. Marciano saw plaintiff three times a year from May of 2003 to August of 2005, diagnosed plaintiff with a herniated lumbosacral disc, and provides extremely abbreviated responses in a section devoted to clinical findings.[40] Tr. 283-90. After noting that "no examination results were reported, and no treatment records provided" from Dr. Marciano, Tr. 25, the ALJ stated that "there is no evidence of active treatment for any condition." *Id.* at 36. Based on these facts, the ALJ proceeded to speculate that "Dr. Marciano did not even take steps, such as ordering radiological testing, to establish a cause for his patient's complaints of back pain," and to conclude that Dr. Marciano's opinion "is not supported by substantial evidence." Tr. 36. As previously noted, however, an ALJ may not reject a treating physician's opinions based on a lack of medical evidence

---

[40] The relevant responses consist of "↓ ROM f/e of L4-L5," "heel pain," "l/s pain," the nature of the pain described as "sharp," the location of the pain described as "lumbar," the frequency of the pain described as "daily," the precipitating factors described as "movement, lifting," and the pain rated as a "4" on a scale of 1-10, with 10 being the highest level of pain. Tr. 283-85.

without first attempting to fill the gaps in the administrative record. *See Rosa*, 168 F.3d at 79 ("an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record") (citing *Schaal*, 134 F. 3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."). Rather than engaging in speculation, the ALJ should have contacted Dr. Marciano to seek additional information before concluding that his opinion lacked evidentiary support.

## C. Consistency of Treating Physicians' Opinions With The Record As A Whole

The ALJ must also consider the extent to which the opinions of a plaintiff's treating physicians are consistent with the medical evidence in the administrative record. If the opinions conflict with substantial record evidence, an ALJ need not accord them controlling weight. *Halloran*, 362 F.3d 28 at 32. However, even where a treating physician's opinion is not controlling, the ALJ must consider the opinion's consistency with the record as a whole in determining how much weight to accord the opinion. Id.

With regard to Dr. St. Martin, the ALJ erred in his analysis of whether Dr. St. Martin's opinion should be accorded controlling weight. Instead of referring to medical opinion or expert testimony that genuinely conflicted with Dr. St. Martin's

opinion and findings, the ALJ improperly applied his own judgment
to the consistency of other doctors' findings with the opinion of
Dr. St. Martin.  For instance, he concluded that Dr. St. Martin's
opinion was "inconsistent with Dr. Sultan's report, which
contains largely normal findings," Tr. 36; but the
characterization of Dr. Sultan's findings as "normal" apparently
derived from the ALJ's application of his own judgment, as Dr.
Sultan himself concluded that plaintiff was disabled.  Similarly,
the ALJ stated that Dr. St. Martin's opinion was "inconsistent
with MRI results," without referring to a medical expert's
opinion as to what those MRI results revealed.

With regard to Drs. McGee and Marciano, however, the ALJ
correctly analyzed inconsistencies between those physician's
opinions and other evidence in the record.  For instance, the ALJ
noted that the findings and opinions of Drs. McGee and Marciano
conflicted with, among other things, the report of Dr. Calvino,
the SSA's consultative examiner.  Unlike Drs. McGee and Marciano,
Dr. Calvino found upon his examination of plaintiff that a
straight leg raise test returned negative results, that plaintiff
had full range of motion of the upper extremities, no sensory
abnormalities, and no more than moderate functional limitations.
He concluded that plaintiff was not disabled.  Therefore, the ALJ
did not abuse his discretion in determining not to accord
controlling weight to the opinions of Drs. McGee and Marciano.

However, in determining how much weight to accord the opinions of each of the treating physicians, the ALJ failed to proceed to consider those opinions in light of the record evidence as a whole. While the ALJ noted that five physicians, including plaintiff's three treating physicians, determined that plaintiff was disabled, he did not explain why the balance of the medical evidence justified disregarding those opinions. Instead, the ALJ briefly examined each of the five physicians' findings and opinions, noted that they conflicted with other evidence in the record, and concluded that none of the opinions was entitled to great or controlling weight. In so doing, the ALJ apparently deemed the fact that the treating physicians' opinions conflicted with certain record evidence sufficient to permit him virtually to disregard those opinions. This is not the correct legal standard. *See Moore*, 2009 WL 2581718, at *9 ("Even if the treating physician's opinion is contradicted by substantial evidence and thus is not controlling, the opinion is still entitled to significant weight."). Instead of dismissing the treating physicians' opinions upon concluding that they conflicted with substantial record evidence, the ALJ should have considered the consistency of those opinions with the entirety of the record evidence in determining how much weight to accord them.

**D. Whether Treating Physicians Are Specialists And Other Factors**

Finally, the ALJ must also consider whether a plaintiff's treating physician is a specialist, and whether any "other factors" of which he is aware "tend to support or contradict the opinion" of a treating physician. 20 C.F.R. § 404.1527(d)(5)-(6). Here, notably, there is no evidence that the ALJ considered the fact that Dr. St. Martin was a neurologist in declining to accord great or controlling weight to his opinion.

The analysis included in the ALJ's decision does not permit me to assess whether and to what extent he considered the requisite statutory factors in determining not to accord special weight to the opinions of plaintiff's treating physicians. Accordingly, I conclude that the ALJ has not adequately set forth "good reasons" for his determination.

**V.   Remedy**

Generally, when an ALJ has applied incorrect legal standards and gaps in the administrative record exist, remand is the proper remedy. *See Rosa*, 168 F.3d at 82-83 ("Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have on numerous occasions, remanded to the [Commissioner] for further development of the evidence.") (citations and internal quotation marks omitted) (alteration in original); *see also Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons'

for the weight given to a treating physician's opinion"); *Wenk v. Barnhart*, 340 F. Supp. 2d 313, 323 (E.D.N.Y. 2004) (remanding case to Commissioner where ALJ did not properly apply treating physician rule). By contrast, where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits." *Rosa*, 168 F.3d at 83.

In this case, the ALJ failed to supplement the administrative record where appropriate. The ALJ cited Dr. Lombardi's testimony that Dr. McGee's treatment notes were "boilerplate" and had "no substance." Tr. 30. If the ALJ believed that Dr. McGee's reports were incomplete or inadequate, he had an affirmative duty, pursuant to 20 C.F.R. § 404.1512(e)(1), to contact Dr. McGee to clarify his opinion.[41] Similarly, as described above, the ALJ noted in his decision that "no examination results were reported, and no treatment records provided" from Dr. Marciano, Tr. 25, but he failed to contact Dr. Marciano in an effort to obtain those records. With regard to Dr. St. Martin, the ALJ noted that "Dr. St. Martin's reports are vague" and include a "cryptic entry," Tr. at 32, but apparently made no attempt to clarify Dr. St. Martin's records. Accordingly, this case is remanded for further development of the

---

[41] In his testimony, Dr. Lombardi himself suggested to the ALJ that Dr. McGee be contacted to explain his findings and RFC assessment. *Id.* at 491.

administrative record and proceedings consistent with this
opinion.

## CONCLUSION

For the reasons stated above, this case is remanded to the
Commissioner for further proceedings consistent with this
opinion.  The Clerk is directed to transmit a copy of the within
to all parties and the Commissioner.


SO ORDERED.

Dated:     Brooklyn, New York
           September 8, 2009


                    By: /s/ Charles P. Sifton (electronically signed)
                          United States District Judge